

1   OWEN, WICKERSHAM & ERICKSON, P.C.
    LAWRENCE G. TOWNSEND CBN 88184
2   LINDA JOY KATTWINKEL CBN 164283
    455 Market Street, Suite 1910
3   San Francisco, California 94105
    Telephone: 415.882.3200
4   Facsimile: 415.882.3232
    Email: ltownsend@owe.com
5   Email: ljk@owe.com

6   *Attorneys for Plaintiff*
    Anne Stéphanie Le Roy-Garcia
7   dba ALMERIANE

8
                    UNITED STATES DISTRICT COURT
9
                NORTHERN DISTRICT OF CALIFORNIA
10

11  ANNE-STÉPHANIE LE ROY-GARCIA,          Case No. **13    1181**
    dba ALMERIANE,
12                                          COMPLAINT FOR INJUNCTIVE RELIEF
                        Plaintiff,          AND DAMAGES FOR:
13
                                            (1) Federal Copyright Infringement;
            vs.                             (2) Federal Trademark Infringement, False
14                                              Designation of Origin and Unfair Competition;
    BRAVE ARTS LICENSING, LLC, a            (3) Common Law Trademark Infringement;
15  California Limited Liability Company;   (4) Unfair and Fraudulent Business Practices;
    GABRIEL GUEZ, an individual; YVETTE     (5) Fraud and Deceit;
16  GUEZ, an individual; INNOVATIVE         (6) Conversion; and
    BUSINESS GROUP, INC., a California      (7) False Federal Trademark Application
17  Corporation; JEAN PIERRE GUEZ, an
    individual; MY TRIBE, a California entity,   Demand for Jury Trial
18  JONATHAN GUEZ, an individual; THE
    CALIFORNIA APPAREL, LLC, a California
19  Limited Liability Company; SOHO
    APPAREL GROUP INC., a California
20  Corporation, IDEELI, INC., a Delaware
    Corporation; NEIMAN MARCUS GROUP,
21  INC. dba LAST CALL, a Delaware
    Corporation; HAUTELOOK, INC., a
22  Delaware Corporation; ZULILY, INC., a
    Delaware Corporation; and DOES 1- 10,
23
                        Defendant.
24

25      Plaintiff Anne Stéphanie Le Roy-Garcia for her complaint against Defendants Brave Arts

26  Licensing, LLC, Gabriel Guez, Yvette Guez, Innovative Business Group, Inc., Jean Pierre Guez,

27  My Tribe, Jonathan Guez, The California Apparel, LLC, Soho Apparel Group, Inc., Ideeli, Inc.,

28  Neiman Marcus Group, Inc. dba Last Call, HauteLook, Inc., Zulily, Inc. and DOES 1- 10, alleges

1   as follows:

2   **NATURE OF THE ACTION**

3       1.     This is an action to redress copyright infringement in violation of the federal

4   copyright laws, 17 U.S.C. § 501, *et seq.*, trademark infringement, false designation of origin and

5   unfair competition, and false federal trademark application, in violation of federal trademark law,

6   15 U.S.C. § 1119 et seq, unfair and fraudulent business practices, fraud and deceit, and

7   conversion under California state law, as the result of willful and unauthorized use by

8   Defendants of Plaintiff's copyrighted expression, trade name, trademarks, name and likeness

9   (collectively, "intellectual property"), attempted registration of Plaintiff's trademark, and failure

10   to pay commissions and royalties due, as more fully set forth hereinafter. Plaintiff seeks

11   injunctive relief restraining infringement by Defendants of Plaintiff's intellectual property,

12   preventing the false trademark registration, damages as the direct and proximate result thereof,

13   damages for conversion and unfair and fraudulent business practices, and related relief.

14   **THE PARTIES**

15       2.     Plaintiff **Anne Stéphanie Le Roy-Garcia** is a prominent visual artist who was

16   born and now lives and creates her works in Almeria, Spain.

17       3.     Upon information and belief, Defendant **Brave Arts Licensing, LLC** ("Brave

18   Arts") is a limited liability company organized under the laws of the state of California, located

19   at 1415 Maple Avenue, Suite 221, Los Angeles, CA 90015. Plaintiff is further informed and

20   believes that Brave Arts regularly does business with wholesale and/or retail customers located

21   in California and/or whose products or services are regularly offered or sold in the state of

22   California, including the counties of Alameda, San Francisco, Marin, Mendocino, Napa, San

23   Mateo, Santa Clara, and Santa Cruz in the Northern District of California.

24       4.     Upon information and belief, Defendant **Gabriel Guez**, is an individual residing

25   within the state of California, County of Los Angeles, and is one of at least two owners of Brave

26   Arts. On information and belief, Gabriel Guez also has an ownership or other revenue-sharing

27   interest in Defendant IBG.

28       5.     Upon information and belief, Defendant **Yvette Guez**, is an individual residing

1  within the state of California, County of Los Angeles, is the mother of Defendant Gabriel Guez,
2  and is one of at least two owners of Brave Arts.

3        6.     Plaintiff does not know the true names of other owners of Brave Arts, who are
4  sued herein as Doe defendants. Defendants Brave Arts, Gabriel Guez, Yvette Guez, and Doe
5  defendants comprising other owners of Brave Arts are hereinafter referred to as the "Brave Arts
6  Defendants."

7        7.     Upon information and belief, Defendant **Innovative Business Group, Inc.**,
8  ("IBG") is a corporation organized under the laws of the state of California, located at 15 Maple
9  Avenue, #222, Los Angeles, CA 90015; and Defendant Gabriel Guez is a registered agent of
10 IBG. Plaintiff is further informed and believes that IBG regularly does business with wholesale
11 and/or retail customers located in California and/or whose products or services are regularly
12 offered or sold in the state of California, including the counties of Alameda, San Francisco,
13 Marin, Mendocino, Napa, San Mateo, Santa Clara, and Santa Cruz in the Northern District of
14 California.

15       8.     Upon information and belief, Defendant **Jean Pierre Guez** is an individual
16 residing within the state of California, County of Los Angeles, is the father of Defendant Gabriel
17 Guez, and is one owner of IBG.

18       9.     Upon information and belief, Defendant **My Tribe** is a business entity operating
19 as a subsidiary of IBG, located at 1415 Maple Avenue, Suites 221-222, Los Angeles, CA 90015.
20 Plaintiff is further informed and believes that My Tribe regularly does business with wholesale
21 and/or retail customers located in California and/or whose products or services are regularly
22 offered or sold in the state of California, including the counties of Alameda, San Francisco,
23 Marin, Mendocino, Napa, San Mateo, Santa Clara, and Santa Cruz in the Northern District of
24 California.

25      10.    Upon information and belief, Defendant **Jonathan Guez** is an individual residing
26 within the state of California, County of Los Angeles, is a relative of Defendants Gabriel Guez
27 and Jean Pierre Guez, and exercises management and control over the business activities of My
28 Tribe.

COMPLAINT                3

1        11.    Plaintiff does not know the true names of other owners, officers, or managers of

2    IBG, who are sued herein as Doe defendants. Defendants IBG, Jean Pierre Guez, My Tribe,

3    Jonathan Guez, and Doe defendants comprising other owners of IBG are hereinafter referred to

4    as the "IBG Defendants."

5        12.    Upon information and belief, Defendant **The California Apparel, LLC,** is a

6    corporation organized under the laws of the state of California, located at 287 S. Robertson

7    Blvd., Suite 205, Beverly Hills, CA 90211. Plaintiff is further informed and believes that The

8    California Apparel, LLC. regularly does business with wholesale and/or retail customers located

9    in California and/or whose products or services are regularly offered or sold in the state of

10   California, including in the Northern District of California.

11       13.    Upon information and belief, Defendant **Soho Apparel Group Inc.,** dba Soho

12   Girls, is a corporation organized under the laws of the state of California, located at 11135 Rush

13   Street, Suite H, South El Monte, CA 91733. Plaintiff is further informed and believes that Soho

14   Apparel Group Inc. regularly does business with wholesale and/or retail customers located in

15   California and/or whose products or services are regularly offered or sold in the state of

16   California, including in the Northern District of California.

17       14.    Upon information and belief, Defendant **Ideeli, Inc.** is a corporation organized

18   under the laws of the state of Delaware, located at 620 8th Ave Fl. 45, New York, NY 10018.

19   Plaintiff is further informed and believes that Ideeli, Inc. regularly does business with wholesale

20   and/or retail customers located in California and/or whose products or services are regularly

21   offered or sold online to customers in the state of California, including in the Northern District of

22   California.

23       15.    Upon information and belief, Defendant **Neiman Marcus Group, Inc., dba Last**

24   **Call,** is a corporation organized and existing under the laws of the state of Delaware, with a

25   principal place of business at One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

26   Plaintiff is further informed and believes that Neiman Marcus Group, Inc. regularly does

27   business across the United States, including California, and Neiman Marcus Group, Inc.

28   regularly does business with California residents in the Northern District of California through

COMPLAINT                                                     4

1  its numerous retail stores in the counties of Alameda, Santa Clara, San Francisco, and Contra
2  Costa, and online.

3      16.     Upon information and belief, Defendant **HauteLook, Inc.** is a corporation
4  organized under the laws of the state of Delaware, located at 1212 S. Flower Street, Suite 300,
5  Los Angeles, California 90015. Plaintiff is further informed and believes that HauteLook, Inc.
6  regularly does business with wholesale and/or retail customers located in California and/or
7  whose products or services are regularly offered or sold online to customers in the state of
8  California, including in the Northern District of California.

9      17.     Upon information and belief, Defendant **Zulily, Inc.** is a corporation organized
10  under the laws of the state of Delaware, located at 2200 First Ave. South, Suite 400, Seattle,
11  Washington 98134. Plaintiff is further informed and believes that Zulily, Inc. regularly does
12  business with wholesale and/or retail customers located in California and/or whose products or
13  services are regularly offered or sold online to customers in the state of California, including in
14  the Northern District of California.

15      18.     Plaintiff does not know the true names of the individuals, corporations,
16  partnerships or other entities sued and identified herein as Does 1 through 10. Plaintiff alleges
17  that said Defendants are liable to Plaintiff under the claims for relief set forth below, and
18  requests leave of this Court to amend this Complaint when the true names of said Defendants are
19  discovered.

20      19.     Plaintiff is informed and believes and thereon alleges that at all times relevant
21  hereto, each of the Defendants, including without limitation the Doe Defendants, was the agent,
22  affiliate, officer, director, manager, principal, partner, joint venture, alter-ego and/or employee of
23  the remaining Defendants and was at all times acting within the scope of such agency, affiliate,
24  officer, director, manager, principal, partner, joint venture, alter-ego and/or employment
25  relationship and actively participated in, profited from or subsequently ratified and adopted, the
26  acts or conduct alleged herein, with full knowledge of all the facts and circumstances, including,
27  but not limited to, full knowledge of the violations of Plaintiff's rights and damages to Plaintiff
28  proximately caused thereby.

COMPLAINT                                                                                                5

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over Plaintiff's claims under and pursuant to 28 U.S.C. §§ 1331 and 1338. This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

21.     Venue in the Northern District of California is proper pursuant to 28 U.S.C.§ 1391(b), § 1392, and § 1400(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and continues to occur in the Northern District of California, and Defendants and/or their agents regularly do business in and/or reside or may be found in the Northern District of California.

**INTRADISTRICT ASSIGNMENT**

22.     Intradistrict assignment to the San Francisco Division is appropriate under Civil Local Rule 3-2(c) because this is an Intellectual Property Action.

**ALLEGATIONS COMMON TO ALL COUNTS**

**A.     Plaintiff's Intellectual Property**

23.     Plaintiff is a prominent visual artist who was born and now lives and creates her works in Almeria, Spain. Plaintiff creates works in various media, including original paintings, drawings, and prints. Plaintiff has developed a unique artistic style which she calls "L'Art Nouveau Andaluz."

24.     Since at least as early as 1998, Plaintiff adopted and has continuously used the artist's name "ALMERIANE" as her pseudonym and designation of source for her artworks. The name and mark ALMERIANE is a fanciful mark invented by Plaintiff. Plaintiff signs her works using ALMERIANE in the stylized form comprising a reproduction of Plaintiff's handwritten signature, as shown in **Exhibit 1** (the "ALMERIANE Stylized Mark"). Plaintiff's artworks have been exhibited and sold worldwide, including in the United States, under the ALMERIANE pseudonym, word mark, and ALMERIANE Stylized Mark since at least as early as 1998. Hereinafter, the pseudonym and word mark ALMERIANE and the ALMERIANE Stylized Mark are referred to collectively as the "ALMERIANE Marks".

25.     Plaintiff has received extensive publicity and critical acclaim for her "L'Art

1  Nouveau Andaluz" artworks marketed under the ALMERIANE Marks. **Exhibit 2** comprises a
2  selected list of such exhibits and awards.

3    26.    Plaintiff is the sole owner of all rights, including copyrights, in and to her "L'Art
4  Nouveau Andaluz" works, and of all rights, including trade name and trademark rights, in and to
5  the ALMERIANE Marks.

6  **B.    The Agreement**

7    27.    In or about April 2011, Defendant Gabriel Guez (hereinafter, "Guez") approached
8  Plaintiff about a licensing deal. Guez represented to Plaintiff that he was experienced and
9  successful in the business of the sourcing, manufacture, design, sale and distribution of garments,
10  and that he routinely sourced artwork for such purposes.

11    28.    Defendant Guez drafted (or had drafted on his behalf) three documents in the
12  English language entitled "Manager & Representation Agreement," "Trademark Authorization
13  Consent," and "Copyright/Worldwide Master License Agreement" to accomplish the licensing
14  deal he wanted with Plaintiff.

15    29.    Plaintiff's native language is Spanish. On information and belief, Guez's native
16  language is French. During all times relevant hereto, Guez and Plaintiff communicated most
17  often in French, and sometimes in English.

18    30.    During this time, Plaintiff's father was dying, and Plaintiff was not able to
19  thoroughly evaluate Guez's proposed licensing deal. However, Guez pressured Plaintiff to agree
20  to the licensing deal and to sign the three documents.

21    31.    The three documents were executed, without any revisions by Plaintiff to Guez's
22  drafts, by Guez and Plaintiff on the following dates: Manager & Representation Agreement: May
23  12, 2011; Trademark Authorization Consent: June 26, 2011, and Copyright/Worldwide Master
24  License Agreement: June 26, 2011. True and correct copies of these three signed documents are
25  attached hereto as **Exhibit 3**. The parties consider these three documents as constituting one
26  agreement, and they are hereinafter referred to collectively as the "Agreement."

27    32.    Under the Agreement, Guez, individually, was granted, for an initial term of 7
28  years, a non-exclusive license to sell Plaintiff's original artwork for a 10% commission payable

COMPLAINT                                                                                        7

1  to Guez, and an exclusive license as Plaintiff's "Worldwide Master Licensee" to create and
2  market prints and merchandise featuring Plaintiff's "L'Art Nouveau Andaluz" paintings under
3  the ALMERIANE Marks (the "Licensed Products"), for payment on a quarterly basis of an 8%
4  royalty to Plaintiff, and to sublicense manufacturing and distribution of the Licensed Products,
5  for payment of a 6% royalty to Plaintiff, subject to certain terms and conditions. Those explicit
6  conditions, *inter alia*, required Guez to obtain Plaintiff's prior written approval before assigning
7  any of his rights to another party; to obtain Plaintiff's pre-approval prior to marketing each
8  Licensed Product and promotional materials therefor; to disclose to Plaintiff all sublicensees; and
9  to account for and timely pay all commissions and royalties due to Plaintiff. The Agreement also
10  authorized Guez, individually, to use and register, as Plaintiff's agent and on Plaintiff's behalf,
11  the ALMERIANE mark in connection with the Licensed Products.

12      33.     The Agreement explicitly provides for termination immediately by Plaintiff upon
13  Guez's breach of the limitations on transfer of his rights, and upon sixty days' notice upon
14  Guez's breach of his pre-approval and payment obligations; that upon termination all rights
15  revert to Plaintiff; and the prevailing party in any actions to enforce the provisions of the
16  Agreement shall recover attorneys' fees.

17  **C.**     **Material Breaches by Defendants and Termination Notice**

18      34.     On information and belief, soon after the Agreement was executed, if not before,
19  the Brave Arts Defendants and the IBG Defendants began arranging for the manufacture of
20  Licensed Products, organizing promotional events including participation in trade shows, taking
21  orders, and distributing Licensed Products to wholesale and retail customers across the United
22  States, including at least the following retailers within the Northern District of California: Emily
23  Lee and Channel 910 in San Francisco, New Threads in Corte Madera, Daisy in St. Helena,
24  Forget Me Not in Aptos, and Safari in Mendocino, as well as online vendors.

25      35.     Plaintiff provided to Guez hundreds of high definition images of her artwork for
26  use on the Licensed Products. She uploaded these image files through an online shared file
27  system to which the Brave Arts Defendants had access.

28      36.     On August 22, 2011, Guez told Plaintiff that two websites, <www.art.com> and

COMPLAINT         8

1   <www.artrising.com>, which were under common control, were displaying and offering for sale
2   small gicleé prints of Plaintiff's artwork in violation of his exclusive worldwide master licensee
3   rights. Plaintiff had not known about these uses of her artwork until Guez informed her. Plaintiff
4   investigated and discovered that the sites were using artwork that she had offered as postcards on
5   <www.art.com> back in 2005. Plaintiff promptly contacted the owner of the sites instructing that
6   the images of her artwork be removed, and the sites complied. Guez also sent a cease and desist
7   message directly to artrising.com. Plaintiff did not receive any revenues from
8   <www.art.com>/<www.artrising.com> for sales of the gicleé prints and does not know if any
9   such prints were actually sold.

10      37.     In November 2011, the Brave Arts Defendants showed some initial samples of
11  potential Licensed Products to Plaintiff during her visit to Los Angeles. Plaintiff attempted to
12  exercise her rights of pre-approval and quality control for the Licensed Products pursuant to the
13  Agreement. However, the Brave Arts Defendants refused to comply with her quality
14  requirements, and thereafter started refusing to provide samples for pre-approval. Sometimes the
15  Brave Arts Defendants showed Plaintiff photographs of finished Licensed Products only after
16  they had been manufactured, and when Plaintiff objected to their quality, the Brave Arts
17  Defendants asserted they could not be changed.

18      38.     During this same time, Plaintiff was shown and approved labels, hand-tags and
19  packaging for the Licensed Products.

20      39.     On or about February 12, 2012, Plaintiff was present at the Las Vegas Magic
21  trade show where Licensed Products were being shown at a booth operated by IBG Defendants.
22  There she saw finished items of clothing being offered for sale, which had been made without
23  her knowledge or pre-approval.

24      40.     At the Las Vegas Magic trade show, Plaintiff also spoke with an individual who
25  expressed to her a desire to purchase an original painting, called *Destino*. Plaintiff agreed to the
26  sale and arranged for Guez to handle the payment and delivery. Guez later claimed that IBG was
27  entitled to a 25% commission on the sale price, in addition to his own 10% commission. Plaintiff
28  vigorously disagreed, and Plaintiff and Guez continued to dispute this issue for the next several

COMPLAINT                                                                                      9

1 months.

2     41.     Plaintiff attended two more trade shows in February and April, 2012, where
3 Licensed Products were promoted and sold for which her pre-approval had not been requested,
4 and continued to insist on her rights of pre-approval and quality control pursuant to the
5 Agreement. However, the Brave Arts Defendants consistently failed to comply with Plaintiff's
6 requests for samples for pre-approval, and failed to comply with Plaintiff's quality requirements.
7 Licensed Products continued to be manufactured, promoted and sold without Plaintiff's consent
8 and often without her knowledge.

9     42.     Plaintiff also discovered that Licensed Products were being sold with labels, hand
10 tags and packaging that did not conform to the samples she had approved, and contained errors.
11 She also discovered that the Brave Arts Defendants had designed, printed and distributed
12 catalogs about Plaintiff and her work without consulting Plaintiff, which contained many errors.
13 Finally, the Brave Arts Defendants posted content without Plaintiff's approval on Plaintiff's
14 URL <www.almeriane.com>, which Plaintiff had given them access to for the purpose of
15 promoting the Licensed Products. When Plaintiff objected, and the Brave Arts Defendants
16 blocked her access to the website.

17     43.     In light of the above-referenced violations and the continuing disputes, beginning
18 in May 2012, Plaintiff stopped providing new images of her artwork to the Brave Arts
19 Defendants.

20     44.     On or about May 16, 2012, the Brave Arts Defendants wired payment for the
21 *Destino* sale to Plaintiff, withholding 35% of the sales price. On the same date, Guez sent a letter
22 to Plaintiff alleging that Plaintiff had breached the Agreement by allowing a 2007 book about her
23 work to appear on a website called Blurb.com. The letter gave Plaintiff 7 days to cure the alleged
24 breach. A true and correct copy of that letter comprises **Exhibit 4**.

25     45.     In response, Plaintiff reiterated her objections to the withholding of an extra 25%
26 from the sale of *Destino*, and to Guez's continuing violations of the pre-approval and quality
27 control provisions of the Agreement. Plaintiff also demanded information about Licensed
28 Products and sublicensees. Although Plaintiff disagreed with the characterization of the

COMPLAINT                   10

1 Blurb.com display of the 2007 book as a breach of the Agreement (which was not available for
2 sale to the public), she had it taken down.

3     46.    On or about May 21, 2012, Guez sent another letter to Plaintiff, this time alleging
4 that her failure to send to the Brave Arts Defendants images of her new artwork constituted a
5 second breach of the Agreement, again with a 7-day deadline to cure. A true and correct copy of
6 that letter comprises **Exhibit 5.**

7     47.    Around this same time, Plaintiff discovered that Licensed Products were being
8 offered for sale at extremely discounted prices. In one case a limited edition print was offered on
9 eBay with an opening bid set at $0.01. Alarmed at the severe harm to her reputation and the
10 value of her artwork such discounted pricing could cause, and upset over the continuing refusal
11 to pay the full amount due to Plaintiff on the sale of *Destino* and the violations of her pre-
12 approval and quality control rights under the Agreement, Plaintiff told Guez that she had lost
13 confidence in his representation and she wanted to terminate the Agreement.

14     48.    Plaintiff then corresponded privately with two sales representatives for the
15 Licensed Products describing the conduct of the Brave Arts Defendants and the IBG Defendants,
16 and announced on Facebook that the Brave Arts Defendants were no longer representing her.
17 Plaintiff believed in good faith that these statements were true.

18     49.    In a letter dated June 6, 2012, Guez asserted that Plaintiff was not entitled to
19 unilaterally terminate the Agreement and asserted that it remained in force. A true and correct
20 copy of that letter comprises **Exhibit 6.**

21     50.    Plaintiff then consulted counsel. She learned that Brave Arts was owned by at
22 least one additional person, Defendant Yvette Guez. Guez never informed Plaintiff that his
23 personal rights under the Agreement were being assigned in part to additional persons or entities
24 and never sought Plaintiff's consent to do so.

25     51.    Plaintiff also learned that on January 20, 2012, Brave Arts had filed a U.S.
26 trademark application Serial No. 85/521460 to register the ALMERIANE Stylized Mark for
27 numerous items of men's and women's clothing, based on a claimed date of first use in
28 commerce of January 1, 2012, and listing Brave Arts as the trademark owner (the

COMPLAINT                     11

1 "ALMERIANE Trademark Application"). The Brave Arts Defendants did not advise Plaintiff
2 that Brave Arts intended to file the ALMERIANE Trademark Application and did not seek her
3 consent to claim ownership of the ALMERIANE Stylized Mark therein. In fact, many of the
4 items claimed in the ALMERIANE Trademark Application had not been made or marketed as of
5 the declared first use date of January 1, 2012. A true and correct copy of the ALMERIANE
6 Trademark Application comprises **Exhibit 7.**

7 52. Around this time, Plaintiff removed certain image files of her artwork from the
8 online file service shared with the Brave Arts Defendants.

9 53. On July 6, 2012, Guez sent a letter to Plaintiff enclosing a statement of royalties
10 earned for the second quarter of 2012, but stating that he was withholding payment because of
11 the breaches he alleged Plaintiff had made, made allegations of defamation, and threatened to file
12 a lawsuit against Plaintiff unless she complied with his demands to provide artwork files. A true
13 and correct copy of that letter comprises **Exhibit 8.** The royalty statement does not identify any
14 sublicensees other than IBG, omits several Licensed Products which were sold at IBG's booths
15 at several trade shows, fails to account for online sales or advances from sublicensees, and
16 appears to significantly under-report total sales and royalties due.

17 54. On July 11, 2012, counsel for Plaintiff contacted Guez and the lawyer who filed
18 the ALMERIANE Trademark Application, David Beitchman, advising that she would be
19 responding to Guez's July 6 letter. Mr. Beitchman replied saying he was unaware of Guez's
20 letter, he was not retained to represent Guez in this dispute, and Plaintiff's counsel should
21 respond directly to Guez.

22 55. On August 15, 2012, counsel for Plaintiff sent a letter to Guez in response to
23 Guez's July 6 letter, entitled "ALMERIANE / Multiple Breaches of Representation Agreement /
24 Notice of Termination with Opportunity to Cure." The letter refuted Guez's claims of breach and
25 defamation, and set forth 9 material breaches of the License Agreement by the Brave Arts
26 Defendants, with times to cure, as follows: (1) Unauthorized assignment of Gabriel Guez's
27 personal contract rights – Time to cure: 7 days; (2) Violations of sub-licensing provisions – Time
28 to cure: 7 days; (3) Failure to obtain prior approval and violations of quality control – Time to

COMPLAINT                                                                                   12

1  cure: 60 days; (4) Violations of good faith obligation to promote the ALMERIANE brand – time

2  to cure: 7 days; (5) Failure to pay full amount due on sale of original work *Destino* – Time to

3  cure: 7 days; (6) Failure to adequately and accurately report merchandise royalties – Time to

4  cure: 60 days; (7) Failure to pay merchandise royalties – Time to cure: 60 days; (8) Sales of

5  licensed goods at severely discounted prices – Time to cure: 7 days; and (9) Attempt to register

6  the ALMERIANE signature mark in Brave Arts' name – Time to cure: 7 days. The letter advised

7  Guez that in the event any of these material breaches was not cured, the Agreement would be

8  terminated, and any further manufacture and distribution of products bearing Plaintiff's art

9  and/or the ALMERIANE Marks would constitute copyright infringement and trademark

10  infringement under federal law. A true and correct copy of this August 15 notice of termination

11  letter comprises **Exhibit 9.** The assertions in the August 15 letter provide more detailed

12  descriptions of the disputed issues concerning <blurb.com>, Plaintiff's statements about Guez,

13  and Guez's material breaches of the Agreement, and is incorporated herein by reference.

14  56.    On August 20, 2012, Mr. Beitchman contacted Plaintiff's counsel stating he was

15  recently retained, and requested additional time to "meaningfully respond." Plaintiff agreed to

16  extend the 7-day deadlines until August 31, 2012.

17  **D.    Brave Arts v. LeRoy-Garcia - State Court Complaint**

18  57.    On August 31, 2012, the Brave Arts Defendants filed a lawsuit against Plaintiff in

19  the Superior Court of the State of California, County of Los Angeles – Central District, Case No.

20  GBC491348 (the "State Court Complaint"). A true and correct copy of the State Court

21  Complaint and Exhibits thereto comprises **Exhibit. 10.**

22  58.    In a cover letter to Plaintiff's counsel enclosing a copy of the State Court

23  Complaint, on behalf of the Brave Arts Defendants Beitchman explicitly refused to address the 9

24  breaches set forth in Plaintiff's August 15 notice of termination letter.

25  59.    The State Court Complaint includes copies of letters from Guez to Plaintiff, but

26  does not include Plaintiff's email correspondence in response thereto, and falsely alleges there

27  were no responses to any of Guez's letters. The State Court Complaint mentions Plaintiff's

28  August 15 notice of termination letter, but does not include a copy of that letter and does not

COMPLAINT                                                                                          13

1  disclose the nature of the 9 breaches set forth therein, or otherwise mention the disputes between

2  the Brave Arts Defendants and Plaintiff regarding the withheld commission on the sale of

3  *Destino*, Guez's failures to comply with his pre-approval and quality control obligations, or the

4  other issues raised by Plaintiff during the course of the parties' relationship which gave rise to

5  Plaintiff's August 15 notice of termination letter.

6       60.    In light of Plaintiff's August 15 notice of termination letter, the Brave Arts

7  Defendants were on notice that their failure to address the 9 breaches set forth therein would give

8  rise to claims against Defendants for federal copyright infringement. On information and belief,

9  the Brave Arts Defendants filed the State Court Complaint knowing that state courts do not have

10  subject matter jurisdiction over federal copyright infringement claims, with the intent to prevent

11  Plaintiff from raising her copyright infringement claims in the state court action and thus make it

12  more difficult for Plaintiff to pursue them.

13       61.    To date, the State Court Complaint has not been served on Plaintiff.

14  **E.    Termination of the License Agreement and Continued Unauthorized Exploitation of**

15      **Plaintiff's Intellectual Property**

16       62.    On October 8, 2012, Plaintiff's counsel sent a letter to Beitchman confirming that

17  the Brave Arts Defendants had failed to redress the material breaches set forth in the August 15

18  notice of termination letter for which the time to cure had been extended until August 31, and

19  accordingly, the Agreement was terminated and canceled. In the letter, Plaintiff also demanded

20  return of her artwork files, an accounting and payment of all royalties due to Plaintiff, and

21  payment of the 25% of the sales price on the sale of *Destino* being withheld by the Brave Arts

22  Defendants. A true and correct copy of that letter comprises **Exhibit 11.**

23       63.    On October 29, 2012, Plaintiff's counsel sent a second letter to Beitchman

24  confirming that the remaining three breaches, which carried a 60-day cure period, had not been

25  redressed, and thus the Agreement was terminated and canceled on those additional grounds. A

26  true and correct copy of that letter comprises **Exhibit 12.**

27       64.    On information and belief, the Brave Arts Defendants and the IBG Defendants,

28  themselves and through their sublicensees including The California Apparel, LLC, and Soho

COMPLAINT          14

1   Apparel Group, Inc. (the "Sublicensee Defendants"), have continued, without Plaintiff's

2   authorization or consent, to develop, manufacture, display, promote, distribute and sell products

3   bearing Plaintiff's artwork and/or the ALMERIANE Marks (the "ALMERIANE Products"),

4   and/or have distributed ALMERIANE Products to retailers including Neiman Marcus Group,

5   Inc. dba Last Call, Ideeli, Inc., HauteLook, Inc., and Zulily, Inc. (the "Retail Defendants"), who

6   have sold the ALMERIANE Products to the public. Sales of ALMERIANE Products by

7   Defendants have continued at severely discounted prices. Defendants continue to use the name

8   and likeness of Plaintiff to promote sales of the ALMERIANE Products. Examples of such sales

9   comprise **Exhibit 13.**

10   65.   The Brave Arts Defendants have not provided to Plaintiff any payments of

11   commissions or royalties since May 2012, and have not provided any accountings of

12   commissions or royalties due to Plaintiff since July 6, 2012. No artwork files have been returned

13   to Plaintiff.

14   66.   Upon information and belief, unless restrained by this court, Defendants plan to

15   continue their unauthorized development, manufacture, display, promotion, distribution and sales

16   of products bearing Plaintiff's artwork and the ALMERIANE Marks, and to continue using the

17   ALMERIANE Marks and Plaintiff's name and likeness to sell such products.

18   **F.   The TTAB Opposition**

19   67.   On October 8, 2012, Plaintiff filed an Opposition action (Opposition No.

20   91207359) against Brave Arts' ALMERIANE Trademark Application in the U.S. Trademark

21   Trial and Appeal Board (the "TTAB Opposition"), on grounds the application was fraudulently

22   filed claiming ownership of the mark by Brave Arts instead of Plaintiff, and the application

23   fraudulently claimed actual use as of January 1, 2012 on many items that had not yet been sold in

24   commerce. A true and correct copy of the TTAB Opposition Complaint comprises **Exhibit 14.**

25   68.   The Brave Arts Defendants filed an Answer to the TTAB Opposition Complaint

26   on November 16, 2012, which enclosed a copy of the State Court Complaint and requested a stay

27   of the TTAB Opposition. A true and correct copy of that Answer (without the exhibits thereto,

28   which are largely duplicative of the Exhibits filed hereto) comprises **Exhibit 15**. Plaintiff has

COMPLAINT                                                                                              15

1     agreed to stipulate to suspend the TTAB Opposition pending resolution of this dispute.

2                     **FIRST CLAIM FOR RELIEF**

3            **Federal Copyright Infringement -- All Defendants**

4                   **17 U.S.C. §101 et seq.**

5       69.     Plaintiff restates and reavers the allegations of paragraphs 1 through 68, inclusive.

6       70.     All of the "L'Art Nouveau Andaluz." artworks (the "ALMERIANE Artworks")

7     constitute original works of authorship created by Plaintiff.

8       71.     The ALMERIANE Artworks constitute copyrightable subject matter under the

9     laws of the United States.

10       72.     Plaintiff has not conveyed any copyrights in the ALMERIANE Artworks to any

11     of the Defendants.

12       73.     Defendants had access to the ALMERIANE Artworks, which were provided

13     directly to the Brave Arts Defendants as set forth above.

14       74.     The images comprising the ALMERIANE Products are identical, strikingly

15     similar and/or substantially similar copies of the artistic expression comprising Plaintiff's

16     ALMERIANE Artworks.

17       75.     Defendants, and each of them, have developed, manufactured, published,

18     marketed, sold, and/or distributed materials bearing copies of the ALMERIANE Artworks,

19     without authority of Plaintiff or her agents.

20       76.     Upon information and belief, the Brave Arts Defendants, the IBG Defendants, and

21     each of them, have willfully induced, caused or materially contributed to the infringing acts of

22     the Sublicensee and Retail Defendants by engaging them to develop, manufacture, display,

23     promote, distribute and sell ALMERIANE Products, and all Defendants are each liable to

24     Plaintiff for direct, contributory and/or vicarious copyright infringement, and/or inducing the

25     same.

26       77.     Defendants and each of them have benefitted economically in the form of

27     continued and increased revenues and enhanced reputation from the promotion and sale of the

28     infringements alleged herein.

78.     As a direct and proximate result of Defendants' infringing acts, contributory infringements and vicarious infringements, Plaintiff is entitled to an accounting of each Defendant's profits and/or Plaintiff's actual damages under the Copyright Act.

## SECOND CLAIM FOR RELIEF

### Federal Trademark Infringement, False Designation of Origin

### and Unfair Competition -- All Defendants

### 15 U.S.C. §1125 et seq.

79.     Plaintiff restates and reavers the allegations of paragraphs 1 through 68 inclusive.

80.     The ALMERIANE Marks are fanciful marks invented by Plaintiff and are immediately distinctive as designations of source for Plaintiff and products bearing Plaintiff's artworks.

81.     Plaintiff is the sole owner of all rights in and to the ALMERIANE Marks.

82.     Defendants have used and are currently using the ALMERIANE Marks and the name and likeness of Plaintiff in connection with the sale, offering for sale, distribution and/or advertising of Defendants' products. Such use is likely to deceive or confuse customers into believing that Defendants' goods and services are endorsed by Plaintiff, are affiliated with Plaintiff, are sponsored or approved by Plaintiff, or are otherwise affiliated with or authorized by Plaintiff. Defendants have made such uses of the ALMERIANE Marks with the intention to cause confusion, and/or to cause mistake, and/or to deceive.

83.     On information and belief, the IBG Defendants have failed to pay commissions to their sales agents for sales of the ALMERIANE Products, and at least one such agent has been compelled to file a lawsuit to recover the commissions due.

84.     Defendants' acts as alleged herein in connection with the ALMERIANE Marks have caused and are causing great and irreparable injury to Plaintiff and to the ALMERIANE Marks and the goodwill represented thereby, in an amount that cannot be ascertained at this time. Unless this infringement is restrained, Defendants' use will cause further irreparable injury leaving Plaintiff with no adequate remedy at law.

85.     By reason of the forgoing, Plaintiff is entitled to injunctive relief against

1  Defendants, restraining further action and infringement, and to Defendants' profits and to

2  Plaintiff's damages as proven at trial. Additionally, Plaintiff is entitled to the costs of this action,

3  including attorneys' fees.

**THIRD CLAIM FOR RELIEF**

**Common Law Trademark Infringement -- All Defendants**

6      86.    Plaintiff restates and reavers the allegations of paragraphs 1 through 68 and 79

7  through 85, inclusive.

8      87.    Defendants have infringed the ALMERIANE Marks by their acts herein above

9  alleged. Said use of the ALMERIANE Marks is without permission or authority of Plaintiff and

10  said use by Defendants is likely to cause confusion, to cause mistake, and to deceive.

11      88.    Plaintiff has been damaged in an amount to be proven at trial, and Plaintiff is

12  entitled to an accounting of Defendants' profits as well as enhanced remedies as provided by law

13  for Defendants' willful conduct.

14      89.    By engaging in the conduct herein above alleged, Defendants have acted

15  willfully, maliciously, oppressively and fraudulently, and Plaintiff is therefore entitled to

16  punitive damages in an amount according to proof.

**FOURTH CLAIM FOR RELIEF**

**Unfair and Fraudulent Business Practices -- All Defendants**

**Cal. Bus. & Prof. Code § 17200 et seq.**

20      90.    Plaintiff restates and reavers the allegations of paragraphs 1 through 89, inclusive.

21      91.    Defendants' above-averred actions constitute unlawful, unfair, and fraudulent

22  business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq.

23      92.    The conduct of Defendants as alleged herein will, unless restrained, damage

24  Plaintiff and cause irreparable harm including the serious impairment of the value of Plaintiff's

25  reputation and the ALMERIANE Marks.

26      93.    As a direct and proximate result thereof, Plaintiff has been and continues to be

27  damaged in an amount to be proved at trial, and Plaintiff is entitled to an accounting of

28  Defendants' profits as well as enhanced remedies provided by law for Defendants' willful

COMPLAINT             18

1 conduct.

## FIFTH CLAIM FOR RELIEF

### Fraud and Deceit -- The Brave Arts Defendants and the IBG Defendants

### Cal. Civ. Code §§ 1572 et seq., 1709 et seq.

94. Plaintiff restates and reavers the allegations of paragraphs 1 through 68, inclusive.

95. When Guez asked Plaintiff to sign the Agreement, he represented to Plaintiff that he personally would perform his obligations as her "Worldwide Master Licensee" thereunder, namely, to negotiate and enter into contracts to make and sell the Licensed Products comprising merchandise, and to manage sub-licensees.

96. On information and belief, Defendant Guez did not have any intention to perform the master licensee duties personally. Instead, Guez intended to use the sublicensee provisions of the Agreement to benefit himself, his relatives and their businesses at the expense of Plaintiff, and Guez and the IBG Defendants had already agreed that the IBG Defendants would perform most of the master licensee obligations. Moreover, on information and belief, the Brave Arts Defendants and the IBG Defendants intended to develop, manufacture and sell Licensed Products without honoring their pre-approval and quality control obligations, to conceal from Plaintiff the true extent of their manufacturing and distribution activities, and to provide false accountings to Plaintiff which would omit sales of Licensed Products in order to divert revenues to themselves and avoid paying royalties to Plaintiff (collectively, all of the intentions and plans referenced herein are hereinafter referred to as the "Exploitation Plans").

97. Guez knew that if Plaintiff had been advised of the Exploitation Plans, Plaintiff would not have agreed to the licensing deal. Guez drafted the three Agreement documents naming himself personally as the party entering into the Agreement, with explicit provisions requiring Plaintiff's consent to transfer of his personal rights, and explicitly limiting his sublicensing rights thereunder the "manufacture and sale" of Licensed Products, in order to conceal the Exploitation Plans and to induce Plaintiff to sign the Agreement documents.

98. Plaintiff relied on Guez's misrepresentations when she agreed to the licensing deal and signed the Agreement documents. Plaintiff would not have entered into the Agreement

1  if she had known about the Exploitation Plans.

2      99.    Guez knew that Plaintiff relied upon his misrepresentations as set forth above as a

3  condition for Plaintiff to enter into the Agreement.

4      100.    The Brave Arts Defendants and the IBG Defendants have obtained gains, profits,

5  and advantages as a result of the wrongful acts set forth above, including unjust enrichment in

6  the amount of unreported and unpaid royalties.

7      101.    As a direct and proximate result thereof, Plaintiff has been and continues to be

8  damaged in a sum to be proved at trial.

9      102.    By engaging in the conduct as herein above alleged, the Brave Arts Defendants

10  and the IBG Defendants have acted willfully, maliciously, oppressively and fraudulently, and

11  Plaintiff is therefore entitled to punitive damages in an amount to be proved at trial.

12  **SIXTH CLAIM FOR RELIEF**

13  **Conversion -- The Brave Arts Defendants**

14  **Cal. Civ. Code § 3336**

15      103.    Plaintiff restates and reavers the allegations of paragraphs 1 through 68, inclusive.

16      104.    Pursuant to the Agreement, Plaintiff is entitled to possess 90% of the sale price of

17  *Destino.*

18      105.    Pursuant to the Agreement, Plaintiff is entitled to possess royalties on all revenues

19  from sales of Licensed Products.

20      106.    At all times herein mentioned, Plaintiff was the owner of the files comprising

21  images of the ALMERIANE Artworks and was and is entitled to their exclusive use and

22  possession following termination of the Agreement.

23      107.    The Brave Arts Defendants have intentionally and substantially interfered with

24  Plaintiff's property by taking possession of an extra 25% of the sale price of *Destino*,

25  withholding royalties due on revenues from sales of Licensed Products, and retaining possession

26  of ALMERIANE Artworks files (the "Converted Property"), all without Plaintiff's consent and

27  in direct contradiction to Plaintiff's explicit demands for the return thereof to her rightful

28  possession.

1    108.   Between the time of said Defendants' retention of the Converted Property for
2   their own use and the filing of this action, Plaintiff has spent funds on attorneys' fees and other
3   actions relating to Plaintiff's rights therein, all to Plaintiff's further damage in a sum to be proved
4   at trial.

5    109.   As a direct and proximate result of the Brave Arts Defendants' conduct as herein
6   above alleged, Plaintiff has also suffered severe emotional distress.

7    110.   Plaintiff is entitled to an accounting of the full value of the Converted Property at
8   the time the Brave Arts Defendants took wrongful possession thereof, plus interest, plus
9   reasonable compensation for the time and money spent by Plaintiff in attempting to recover the
10  Converted Property, as well as enhanced remedies as provided by law for the willful conduct of
11  the Brave Arts Defendants.

12    111.   By engaging in the conduct as herein above alleged, the Brave Arts Defendants
13  have acted willfully, maliciously, oppressively and fraudulently, and Plaintiff is therefore entitled
14  to punitive damages in an amount to be proved at trial.

15                          **SEVENTH CLAIM FOR RELIEF**

16         **False Federal Trademark Application -- The Brave Arts Defendants**

17                              **15 U.S.C. §§ 1119, 1125**

18    112.   Plaintiff restates and reavers the allegations of paragraphs 1 through 68, inclusive.

19    113.   The Brave Arts Defendants directed that the ALMERIANE Trademark
20  Application be filed claiming ownership by Brave Arts knowing that Plaintiff is the exclusive
21  rightful owner of the ALMERIANE Stylized Mark and that Applicant was not entitled to claim
22  ownership in the subject ALMERIANE Stylized Mark.

23    114.   The Brave Arts Defendants allowed items to be identified on the ALMERIANE
24  Trademark Application as already in use as of January 1, 2012 knowing that such items had not
25  been made or distributed as of that date.

26    115.   The Application was filed with the willful intent to deceive the United States
27  Patent and Trademark Office, in order to obtain a U.S. Trademark Registration claiming
28  ownership by Brave Arts and for goods to which Applicant was not entitled.

COMPLAINT                                                                        21

116.    Brave Arts is not entitled to own a federal registration for the ALMERIANE Stylized Mark.

117.    Plaintiff is entitled to injunctive relief directing the TTAB to sustain the TTAB Opposition and deny with prejudice Brave Arts' attempt to register the ALMERIANE Trademark Application.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.    That Defendants, Defendants' agents, employees, and licensees, and all persons or entities in active concert or participation with any of them who receive notice of the Court's Order, be preliminarily and permanently enjoined from:

A.    Engaging in, causing, or inducing others to engage in, the use, creation, manufacture, publication, display, marketing, promotion, advertising, distribution, sales and/or other exploitation of any products or materials, including without limitation the Licensed Goods, ALMERIANE Products, and online content including on <www.almeriane.com>, that incorporate, reflect, or contain (1) the ALMERIANE Artworks, or any portion thereof, or any substantially similar copies thereof; and (2) the ALMERIANE Marks, or anything confusingly similar thereto or likely to cause injury to Plaintiff's reputation ("Infringing Materials"); and

B.    Otherwise infringing any of Plaintiff's copyrights or trademarks.

2.    That Defendants, their agents, employees, and licensees, and all those acting under its direction and pursuant to its control, be directed to deliver up for destruction all Infringing Materials, and other matter employed in the creation, distribution and sale of Infringing Materials.

3.    That Defendants, and each of them, render an accounting of all of their respective sales of ALMERIANE Products.

4.    That Defendants be required to pay Plaintiff monetary relief as follows:

A.    Any and all profits made by Defendants as a result of the aforesaid infringement, unfair and fraudulent business practices, fraud and deceit, together with interest thereupon in an amount according to proof;

B.    Plaintiff's actual damages as a result of the aforesaid infringements;

COMPLAINT                                                                                          22

1        C.    Damages for conversion, including an accounting of the full value of the

2 Converted Property at the time the Brave Arts Defendants took wrongful possession thereof, plus

3 interest, plus reasonable compensation for the time and money spent by Plaintiff in attempting to

4 recover the Converted Property, according to proof;

5        D.    Punitive and exemplary damages in an amount as this Court shall deem

6 just and proper;

7        E.    Attorneys' fees under the Agreement; and

8        F.    Costs of this Action.

9    5.    That the Court order the U.S. Patent and Trademark Office to sustain the TTAB

10 Opposition and deny with prejudice Brave Arts' ALMERIANE Trademark Application.

11    6.    That the Court award Plaintiff such other and further relief as this Court shall

12 deem just and proper.

13                            OWEN, WICKERSHAM & ERICKSON, P.C.

14

15 Dated: _3/12/13_         By _____

16                           Lawrence G. Townsend
Linda Joy Kattwinkel

17                           *Attorneys For Plaintiff*
Anne Stéphanie Le Roy-Garcia

18                           dba Almeriane

19                      DEMAND FOR JURY TRIAL

20        Plaintiffs hereby demand a jury trial of all issues in the above-captioned action which are

21 triable to a jury.

22                         OWEN, WICKERSHAM & ERICKSON, P.C.

23

24 Dated: _3/12/13_         By _____

25                           Lawrence G. Townsend
Linda Joy Kattwinkel

26                           *Attorneys For Plaintiff*
Anne Stéphanie Le Roy-Garcia

27                           dba Almeriane

28

**EXHIBIT 1**

EditRegion3

 ©ALMERIANE

<u>Español</u>    /    <u>English</u>



*Artist Painter*

*ART NOUVEAU ANDALUZ copyright*





<u>ENTER</u>

OFFICIAL WEBSITE OF ALMERIANE

copyright Almeriane 2012

 facebook

**EXHIBIT 2**

# " Almeriane "

*Quotes*

*Art Gallery*



I was born in Almería, Spain and I was raised in France. I started drawing at the age of 3. I tried many techniques like charcoal or pastel, before ending up painting in oil and watercolor primarily.

I travelled to France (because I lived and studied over there), to Spain (the Peninsula and Tenerife), California (USA), and I finally, came back to my hometown.

I created my own style often described as "**Art-Nouveau Andaluz**".

Passion leads my brushes, poems inspire my oil paintings and watercolors.

- **Collective exhibits:**

**2009,** exhibit in **FICA 2009,** in **Sevilla-Spain,** with the empresa de gestion cultural Mester Artis; exhibit in the **Carrousel of the Louvre Museum,** in **Paris** with the French art gallery Reference Gallery

**2007,** exhibit in the **Agora Art Gallery** in *New York*; solo exhibit in the **Casa Consistorial Museo** in *Antequera* (*Malaga*-Spain)**; Mostra Antiqua Florentia** in the Galleria Centro Storico in *Florence* (Italy); **Salzburg Kunstmesse 2007** (Austria), represented by the German art gallery **Alta Ripa**.

**2006:** On March, in **Spain**: exhibit in the art gallery **Royal Atenea** in Roquetas de Mar.

On november, in **Paris-France**: from 9th-19th , exhibit in the **international Salon des Artistes Français** and the **International Salon du Dessin et de la Peinture à l'Eau** in the **Grand Palais**

On December, in **Paris-France**: from the 14th-17th, exhibit in the International Salon de la SNBA in the **Carrousel du Louvre** .

**2005:** exhibits in the on-line art gallery Art.Com (www.art.com), in the French on-line art-gallery **DROUOT** COTATION (www.drouot-cotation.org), in the Irst Feria Internacional del Arte contemporaneo de Almeria (*Spain*) with the art gallery Indalomar and in the Feria Internacional del Arte Contemporaneo de Marbella (*Malaga*-Spain) with the art gallery Lecrin and in the International **Florence** Biennale 2005 (*Italy*) in representation of Spain.

**2004:** exhibits in la Fundación Centro de Estudios Andaluces (*Almeria*), in the on-line art gallery Arte Libre (www.artelibre.net), in an *Austrian* on-line art gallery Galerie im Internet (galerie.eder -net.at) and in Expo Arte in *Madrid*.

**2003, Spain**: exhibits in La Galeria San Vicente 31 (*Sevilla*) and in la Casa Consistorial in Fiñana.

**1998, California** (USA): exhibits in the Carnegy art gallery in *Turlock* and in *Oakdale*.

**1995, Tenerife** (Canarian Islands-Spain): exhibits in Bajamar and Tegueste

- **Solo exhibits:**

**2012,** April-June, exhibit of my "Melodia de las 7 Torres" art serie, at the Museo Castillo de Santa Ana in Roquetas de Mar - Spain

**2011,** November, exhibit in the **BOA Gallery in Los Angeles**

**2010,** from June 3rd til 21th, exhibit in the sala de exposiciones del **Centro Cultural Integrado Isabel la Católica** in **Medina del Campo** (Valladolid-Spain), september, solo exhibit in Osuna (Sevilla) - Spain

**2009:** in the Teatro Auditorio de Roquetas de Mar - Spain. TV interview of this exhibit, following this link: http://www.youtube.com/watch?v=b1CDEHpxzqQ

**2007:** in the Sala de exposicion del Ayuntamiento de **Antequera-Malaga (Spain)**

**2006:** exhibit in the Museo del Aceite in **Almería.**

**2003:** exhibit in la Instalación Juvenil de *Almería*, to inaugurate a new place for art exhibitions.

**2002, Spain**: exhibit in la Sala Grafos in *Almería*.

**2001, California**: exhibit in the Carnegie Art Gallery

- **Events:**

**2012,** February 13-15th, exhibit and launch of my clothing brand at the MAGIC SHOW, in Las Vegas (USA) - Fashion show in New York - April, Fashion Show in Atlanta

- **Awards and contests:**

**2012,** awarded with the "Toile d´or 2012" by the *National Federation of the French Culture*;

**2007**: Received the "Toile d´Or 2006" from the *National Federation of the French Culture*; **"Premio Sever 2007"** from the *Sever Center* (Italy); **"Premio Calice D´oro 2007"** from the *Galleria Centro Storico* (Florence-Italy); **"Premio D´onore 2007"** (Italy)

**2005**: participation in the artistic contest Generación 2006 from the Caja Madrid (*Madrid*).

**November 2004, thanks to my web site, I´ve been selected from the International Florence Biennale Committee to participate in the 2005 Florence Biennale (Italy).**

**2004**: Participation in the Lexmark European Art Prize 2004, in the 2nd Painting contest of the Centro Educativo Agave, in *Almería* and in the Certamen de Pintura Realista y figurativa in the art gallery Clave (in *Murcia*).

**2003**: participation in the 18th Painting Contest in *Fiñana*.

**2002,** in Spain: participation in the Poster´s Contest for the Feria de *Almería*.

**1999**: participation in the County Fair of *Turlock* and I won the **1rst Prize** in Oil category and a **Special Award**.

**1998,** in **California** (USA): participation in the Carnegy Gallery Tour contest, in *Turlock*, during which I rented one of my painting to a Business, in the Carriage Fall Contest in *Oakdale*, where I received a **Revelation Prize**.

• **Private Collection:**

USA, Canada, Japan, France and Spain: in Tenerife, Almería, Sevilla, China and in the **Real Palace of the Zarzuela and in the Thyssen Baronese, Carmen Cervera, private collection,** in Madrid.

• **Bibliography:**

**2011:** Larousse dictionnary 2011

**2009**: Catalogo de cotizaciones 2009-2010 (Alba Editrice-Italy)/ Diario de Almería/

**2008**: Larousse dictionnary 2008/ The world leader art guide in art market estimation AKOUN 2008 / Almeria Actualidad newspaper

**2007**: Arts et Actualites Magazine (Francia)/La Voz de Almeria/ El Mundo / Chianti Metropoli (Italy)/ El Efebo Antequera-Malaga

**2006**: El Ideal / El Mundo / Gente Magazine / Univers des Arts (France)/ Artistical book "El arte y la palabra"/ Larousse dictionnary 2007/La Voz de Almeria

**2005**: Book of the Florence Biennale; Larousse Dictionnary of the quoted artists from the 15th century until nowadays and La Voz de Almeria.

**2004**: "Arte Libre", book with 53 international painters from the art gallery Arte Libre; La Voz de Almeria and El Ideal.

**2003**: El Ideal; "Quercus Review", a journal of Litterature & Art 2003 (3rd edition).

**2002/2003**: La Voz de Almeria.

• **Interviews on TV and Radio:**

**2009:** Canal Sur Radio/ Canal Si TV/ El Faro Television/ Canal Sur TV

**2006**: Canal Sur Radio, el Informativo (TV News) and Andalucia Directo (Canal Sur TV).

**2005**: Popular TV, Onda Cero Radio, ACL Radio and Canal Sur Radio.

**2004**: on Canal Sur Radio, ACL Radio, Cadena SER and Andalucia Directo on Canal Sur TV.

**2003**: on Ondamar TV and Canal Sur Radio.

**2002**: Miramar (Canal 28 TV) and on Canal Sur TV.

For all commercial purposes: http://www.almeriane.com

**EXHIBIT 3**

## MANAGER & REPRESENTATION AGREEMENT

This agreement is established between the following parties, this day May 12th, of 2011 in order to ensure the representation of *"Almeriane"©* and *"L'Art Nouveau Andaluz"©*, by the Manager.

- The Artist : "Anne-Stéphanie Le Roy-Garcia" just named forward by *"Almeriane"©*, whose address is  Villa Bataan, C/Rey Sol, 5- Castell Del Rey, 04002 Almeria, Spain.
- The Manager: "Gabriel Guez", whose address is 424 S Holt Ave PH 5 ~ Los Angeles, CA 90048, USA.

1/ The Artist *"Almeriane"©* and The Manager "Gabriel Guez" are agreeing that starting this day May 12, of 2011; The Manager "Gabriel Guez" is authorized to promote, represent, deal, communicate and sell "L'Art Nouveau Andaluz"© property of *"Almeriane"©* , in the best interest and on behalf of the Artist *"Almeriane"©* .

2/ The Manager "Gabriel Guez" is accepting to represent *"L'Art Nouveau Andaluz"©* and the name of *"Almeriane"©* and will answer to any meeting (conference calls) information request and Artistic directives from the Artist *"Almeriane"©* in order to promote *"L'Art Nouveau Andaluz"©* and advise the Artist *"Almeriane"©* in her best interest.

3/ Concerning the reproductions: *"L'Art Nouveau Andaluz"©* and the Name of the Artist: *"Almeriane"©*, Her Art and paintings are the sole and unique property Ad Vitam of Anne-Stéphanie Le Roy-Garcia as she detained the *Copyrights*.

However pending a future certified *"Worldwide Master Licence"* to be attributed *solely* to Her Manager "Gabriel Guez", by The Artist *Almeriane©* for a period of time of 7 years  renewable.

The Manager "Gabriel Guez" would be authorized of developing **reproductions** on manufactured products of *"L'Art Nouveau Andaluz"©* and the name of *"Almeriane"©* and realize business with no  restriction (Productions, Commercialization, Sales & Distributions)  in exchange of 8% "Royalties" compensation to the Artist, respecting the Artist *Copyrights*.

4/ Concerning the original artworks: The Artist, *"Almeriane"©* is recognizing The Manager "Gabriel Guez" as her official Manager and grants Him the rights to show *"L'Art Nouveau Andaluz"©* and further negotiate and sell *"Almeriane"©* paintings on her behalf and for her account, in exchange of 10% commissions of each sale to "Gabriel Guez".

5/ This Agreement is taking effect starting this day May 12th of 2011 and would not need money compensation from the Artist *"Almeriane"©* to the Manager: "Gabriel Guez", just the engagement from the Artist *"Almeriane"©* to grant Her Manager: "Gabriel Guez" with a future *Worldwide Master License* on *"Almeriane"* © Arts and Name after legal certification; and provide Him with new illustrations, paintings and design to manufacture "L'Art Nouveau Andaluz"© for a period of time of 7 years, renewable protecting both the Artist *"Almeriane"©* rigths and the Manager and future Worldwide Master License owner "Gabriel Guez" interests.

*Read, Approved and Signed on May 12th, 2011.*

Anne-Stéphanie Le Roy-García,          Gabriel Guez,
said the Artist *"Almeriane"©*.          said the Manager.

*Read and approved*          REAP & APPROVED

_Slecny G_. said ALMERIANE©

05/12/2011          OS/12/20M

1

## TRADEMARK AUTHORIZATION CONSENT

THIS TRADEMARK AUTHORIZATION (this "Agreement") is made and entered into effective as of the 26th of JUNE, 2011 (the "Effective Date"), by and between *Almeriane©* Alias *Anne-Stephanie Leroy-Garcia (The "Artist")*, and *Gabriel Guez (The Manager/Worldwide Master License Holder")*

*RECITALS:*

A) The Artist owns all proprietary rights in and numerous Copyrightable works, generally described as *Almeriane©* and *"L´Art Nouveau Andaluz"* paintings, illustrations and Arts, all of which are displayed and viewable at www.almeriane.es or upon request from the Artist, (hereinafter the "Work"), and grants *Gabriel Guez* the exclusive right to TRADEMARK and further use for commercial purposes the name *Almeriane©*.

B) *Gabriel Guez*, desires to obtain, and *the Artist* has agreed to grant a
**Trademark Authorization**, authorizing the right to Trademark and commercialize the Work by Gabriel Guez, Worldwide Master License Holder, in accordance with this Authorization, with no geographic restriction and no category limitation.

NOW THEREFORE, for and in consideration of the premises and the mutual covenants and Agreement, this Authorization shall prevail and show good faith and consent from both the Artist and the Worldwide Master License Holder, agreeing to have the right of use and registration of *Almeriane´s* Trademark, by *Gabriel Guez*.

**The Artist:**
*Anne-Stephanie Leroy-Garcia*
*Villa Bataan*
*Calle Rey sol, 5*
*Castell Del Rey 04002, Almeria*
*Spain*

The artist
Anne · Stephanie Le Roy Garcia
ALMERIANE
A Leroy G

**The Worldwide Master License Holder:**
*Gabriel Guez*
*424 South Holt Avenue*
*PH 5*
*Los Angeles, California*
*U.S.A*

THE WORLDWIDE MASTER LICENSE
HOLDER

GABRIEL GUEZ

Rozta Ebrani



## COPYRIGHT/WORLDWIDE MASTER LICENSE AGREEMENT

THIS COPYRGHT/WORLDWIDE MASTER LICENSE AGREEMENT (this "Agreement") is made and entered into effective as of the 26th day of JUNE, 2011 (the "Effective Date"), by and between *Almeriane©* Alias *Anne-Stephanie Le Roy-Garsia* (the"Artist"), and *Gabriel Guez,*("the Artist Manager/Worldwide Master License Holder").

*RECITALS:*

(A) The Artist, owns all proprietary rights in and to numerous Copyrightable works, generally described as *Almeriane©  and 'L'Art Nouveau Andaluz'*paintings, illustrations and Arts, all of which are displayed and viewable at www.almeriane.es or upon request from The Artist, (hereinafter the "Work"), and grants *Gabriel Guez* the exclusive right to license others to produce, copy, make, or sell the Work.

(B) The Artist owns all rights in and to the Work and retains all rights to the Work which are not transferred herein, and retains all common law copyrights and all federal copyrights which have been, or which may be granted by the Library of Congress.

(C) *Gabriel Guez* , desires to obtain, and the Artist has agreed to grant, a **Worldwide Master License** authorizing the use of the Work by *Gabriel Guez* , Future Worldwide Master License Holder in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, as set forth herein, The Artist and *Gabriel Guez The Manager/*Future World Master License Holder agree as follows:

*1.   Grant of Worldwide Master License.*

(A) *Anne-Stephanie Le Roy-Garsia* hereby grants to *Gabriel Guez,* in accordance with the terms and conditions of this Agreement, an exclusive, Worldwide Master License to use the Work and to otherwise copy, make, use, promote and sell the Work. Worldwide Master License Holder may copy and sell the Work in accordance with the terms set forth below, for general advertising materials and point of sale displays, advertising, and other promotional materials for the Work. Further, World Master License Holder may use the Work in conjunction with a Magazine, Televisual Program, an Internet site, Showrooms or Trade Shows for the advertisement and sale of the Work as described herein with no geographic restriction and no category limitation.

ASLRG

GG

3

(B) The Worldwide Master License Holder retains all rights to packaging designs, styles designs, pattern designs, process designs and trade dress, for the promotion, marketing and sale of the Work which Worldwide Master License Holder develops, creates, orders, purchases or otherwise owns.

(C) *Anne-Stephanie Le Roy-Garcia* hereby accepts such license and agrees that *Gabriel Guez* The Future Worldwide Master License Holder shall not use the Work except in accordance with the terms and conditions of this Agreement.

*Gabriel Guez*, The Future Worldwide Master License Holder acknowledges and agrees that the Worldwide Master License granted herein is exclusive and will be lasting for a period of 7 years renewable.

    *1.*    *Ownership of Works.*

(A) Worldwide Master License Holder acknowledges that The Artist is the sole and exclusive owner of the Work and of all associated federal registrations and pending registrations, and Worldwide Master License Holder shall do nothing inconsistent with such ownership. Worldwide Master License Holder further agrees that it will not claim ownership rights to the Work, or any derivative, compilation, sequel or series, or related Work owned by or used by the Artist. Worldwide Master License Holder agrees that nothing in this Agreement shall give Worldwide Master License Holder any right, title, or interest in the Work other than the right to use the same in accordance with this Agreement.

*2. Term and Termination.*

(A) This Agreement shall commence as of the Effective Date and shall continue in full force and effect for a period of seven (7) years, and shall automatically renew for additional seven (7) years periods, with a Bonus to the Artist at renewal signature.

(B) In the event that Worldwide Master License Holder seeks bankruptcy, either voluntarily or involuntarily, The Artist may, at its sole discretion, terminate this Agreement. Upon filing for, or being subjected to bankruptcy, Worldwide Master License Holder shall name The Artist as a creditor for all royalties which are due, or may become due, under the terms of this Agreement.

(C) In the event that Worldwide Master License Holder sells all of its assets to a third party, or otherwise cease to exist in its current form, The Artist, at its discretion, may immediately terminate this Agreement.

ASLRG                                                           GG

(D) Upon termination or expiration of the Worldwide Master License granted under this Agreement by operation of law or otherwise, all rights (including the right to use the Work) privileges and obligations arising from this Agreement shall cease to exist, except for Worldwide Master License Holder obligation to pay royalties to The Artist pursuant to the terms herein.

(E) Upon termination of this Agreement, The Artist agrees to allow Worldwide Master License Holder six (6) months to cease all use of the Work, including a reasonable time to change labels, packaging and advertising, and twelve (12) months to deplete existing inventories of goods bearing the Work. Worldwide Master License Holder agrees to discontinue use of the Work, upon termination of this Agreement, as quickly as practicable, and in no event longer than the time specified herein.

*3.   Fees.*

(A) For renewals or extensions of this Agreement, Worldwide Master License Holder agrees to pay The Artist a per-define future one time royalty of $26,000.00

(B) Worldwide Master License Holder shall pay to the Artist a royalty of eight percent (8%) of gross receipts from sale of the Work (gross receipts is the sale price less any rebate, discount or return actually realized, gift and promotional item) for each month.
All remaining royalties are to be paid within ten (10) days after the calendar end of the month (30th or 31st)

(C) Failure of Worldwide Master License Holder to make any payment required under this Agreement when such payment is due, shall, at The Artist's option, terminate this Agreement.

The Artist will provide written notice to Worldwide Master License Holder of termination of this Agreement for failure to make a required payment, within sixty (60) days from the due date of the payment.

*4.   Use of Work.*

(A) The Artist shall have review over the quality of use of the Work and the quality of goods sold under the Work. At the option of the Artist for all advertisements and packaging of the Work, Worldwide Master License Holder shall (i) display with the Work an approved symbol notifying the consumer of the copyright owned by The Artist and licensed within this Agreement.
The Artist will provide to Worldwide Master License Holder an approved copyright notice to be prominently displayed on each copy of the Work published. Worldwide Master License Holder agrees to (ii) mark all Work with any reasonable copyright and/or trademark notices provided by The Artist and (iii) comply with any reasonable standards promulgated by The Artist that relate to the use of the Work by Worldwide Master License Holder.

ASLRG                                                                          GG

(B)  The Artist and Worldwide Master License Holder agree that in order to generate and expand their mutual benefits, income and royalties, Worldwide Master License Holder will explore and apply sub-licensing, meaning that *Gabriel Guez* is exclusively authorized by the Artist  and would have the Rights to negotiate, sale and further sub-license third companies to produce and sell reproductions of the Work under his approval and control at The Artist's knowledge.

Worldwide Master License Holder would be in charge to collect the Artist royalties of six percent (6%) from any sub-licensed companies and pay them to the Artist Quarterly  within ten (10) days after the calendar end of the 4th month (30th or 31st) after official sales reports are submitted from sub-licensed companies, and money wired to Worldwide Master License Holder bank account.

(C)  Upon execution of the Agreement Worldwide Master License Holder shall advise The Artist prior to making any change or modification to the Work, Worldwide Master License Holder shall provide the Artist, upon The Artist's request, with representative samples of how Worldwide Master License Holder is using the Work. If, at any time, any use of the Work fails to conform to standards set by The Artist, The Artist may provide to Worldwide Master License Holder notice of said failure. Worldwide Master License Holder  shall cure said failure within sixty (60) days from the date of such notice, or such longer period as may be reasonably necessary to cure said failure, so long as Worldwide Master License Holder is diligently pursuing the cure. In the event that said failure is not cured within the period described in the preceding sentence,The Artist may then terminate this Agreement.

If the Artist fails to approve any modifications or changes to the Work within seven (7) days of Worldwide Master License Holder advising, The Artist's approval shall be deemed to have been granted.

(D)  Upon termination of this Agreement for any reason, Worldwide Master License Holder shall be entitled to sell, distribute, or otherwise dispose of any existing inventory of the Work, but shall otherwise discontinue immediately all use of the Work or any publication confusingly similar thereto, cooperate with The Artist in applying to the appropriate authorities to cancel recording, if any, of this Agreement from all government records, and destroy all printed materials related to the Work; and all rights in the Work and the goodwill appurtenant thereto shall revert to and remain the property of The Artist

*5.    Indemnification.*

(A)  Worldwide Master License Holder shall fully indemnify, defend, and hold harmless The Artist from and against any and all claims, losses, damages, expenses, and liability -- other than those for infringement, non-including without limitation, suits arising from offering, promoting, advertising, sale, or use by Worldwide Master License Holder, or any of its authorized sub licenses, of the Work, whether or not such use conforms to standards set by The Artist, provided that such claim, loss, damage, expense, or liability does not arise from the negligence of The Artist.

(B)  The Artist shall fully indemnify, defend, and hold harmless Worldwide Master License Holder from and against any and all claims, losses, damages, expenses and liability, including claims of copyright infringement, arising from Worldwide Master License Holder's  authorized use of the Work.

ASLRG                                                                                              GG

The Artist does agree to indemnify Worldwide Master License Holder for trade dress infringement directed to the appearance or design of the packaging and advertising for the Work which has been created, or is owned, by Worldwide Master License Holder.

(C) The Artist has the right, but shall not be obligated, to maintain federal registration of the Work. In the event that Worldwide Master License Holder becomes aware of any claimed or alleged infringement of the Work by a third party, World Master License Holder shall promptly advise The Artist in writing of the nature and extent of such infringement or dilution. The Artist has no obligation to take any action whatsoever in the event that any infringement or dilution occurs with respect to the Work, but The Artist shall support any actions taken by the Worldwide Master License Holder.

(D) In the event The Artist sues or takes other action, legal, equitable, administrative, or otherwise, to stop an infringement or dilution of the Work, Worldwide Master License Holder shall cooperate fully with the Artist, but Worldwide Master License Holder shall not be obligated to pay any costs or expenses.

(E) Worldwide Master License Holder has no right to enforce the Work through litigation without prior written authorization of The Artist. In any legal action arising from use, or ownership rights of the Work, where both The Artist and Worldwide Master License Holder are co-parties, The Artist doesn't retains the right to control the litigation, including any and all settlement negotiations.

(F) Worldwide Master License Holder and his enterprises cannot be hold responsible for any claims or lawsuit arising from the Work resemblances to existing persons (friends, family , celebrities and so on...) as the Work are property of The Artist and creations of his own inspiration, and were conceived and created with subject consents and awareness with no previous litigation nor claims. Worldwide Master License Holder cannot be hold responsible as this Agreement grants Arts and Work exploitation for reproductions to the Worldwide Master License Holder. In any cases, The Artist shall express support, hold harmless and fully defend The Worldwide Master License Holder

### 6.   *Assignment.*

This Agreement (including, without limitation, the Worldwide Master License granted hereunder) is personal to *Gabriel Guez* and shall not be assigned or transferred by Worldwide Master License Holder, including, without limitation, by operation of law, except that, with prompt written notice to the Artist, the Agreement maybe transferred to a purchaser of all or substantially all of the assets of Worldwide Master License Holder. Any attempt on the part of Worldwide Master License Holder's to transfer Worldwide Master License Holder's rights under this Agreement except as provided herein shall be invalid and void. The Artist shall have the right to assign its rights and obligations under this Agreement and all its right, title and interest in the Work with the consent of Worldwide Master License Holder.

ASLRG

GG

7

7. *Validity of Works.*

*Gabriel Guez* admits the validity of all copyrights for the Work and all associated registrations and acknowledges that any and all rights that might be acquired by Worldwide Master License Holder's because of its use of the Work shall inure to the sole benefit of The Artist provided that this Paragraph 8 shall not entitle The Artist to all or any portion of the profits or revenues from Worldwide Master License Holder's permitted uses hereunder, except for the fees described in Paragraph 3&4.

8. *Notices.*

Any notice, demand or request required or permitted to be given under the provisions of this Agreement shall be in writing and delivered personally or by international carrier like UPS or Fedex or by registered or certified mail, return receipt requested, with postage prepaid and addressed to the following persons and addresses, or to such other addresses or persons as any party may request by notice in writing to the other such party:

*Worldwide Master License Holder:*

Gabriel Guez
424 S Holt Ave ~ PH5
Los Angeles, CA 90048
United States Of America
with a copy to:

*The Artist:*
Anne-Stephanie Le Roy Garcia
Almeriane©
Villa Bataan,C/Rey Sol, 5-Castell Del Rey
04002 Almeria, Spain

**Any such notice shall be effective when received.**

9. *Insurance.*

Upon the reasonable request of The Artist, Worldwide Master License Holder agrees to provide to The Artist proof of general liability insurance, in any minimum amount which is required by the State in which Worldwide Master License Holder is incorporated. Said insurance policy shall provide coverage to any third party for injuries claimed to arise from the products advertised and sold by Worldwide Master License Holder which relate to the Work and shall also contain a general advertising liability clause, insofar as such clause is allowed by Federal or State law. The insurance policy shall provide coverage to Worldwide Master License Holder's for indemnification of The Artist under the terms of Paragraph 5 herein.

10. *Arbitration.*

8

All disputes arising from the terms of this Agreement may be subjected to binding arbitration upon consent of both parties, with one arbitrator selected by each party, and a third arbitrator selected by the two chosen arbitrators. This Agreement shall be governed by and construed in accordance with, the laws of the State of California without regard to the conflicts of laws rules thereof and any arbitration shall be brought in California using Californian laws as business is conducted from California.

**11. Independent Business Relationship.**

The Artist and The Worldwide Master License Holder are independent contractors and are not and shall not be construed as joint venturers, partners, employer/employee, and neither shall have the power to bind or obligate the other, except as set forth in this Agreement.

**12. Miscellaneous.**

(A) This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof, superseding any and all prior agreements, understandings, negotiations, and discussions. No amendment, alteration, modification, or waiver of this Agreement shall be binding unless evidenced by an instrument in writing signed by the party against whom enforcement thereof is sought.

(B) In the event it becomes necessary for either party to file a suit to enforce this Agreement or any provisions contained herein, and either party prevails in such action, then such prevailing party shall be entitled to recover, in addition to all other remedies or damages, reasonable attorney's fees.

(C) If any provision of this Agreement, or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement, or the application of such provisions to any other persons or circumstances, shall not be affected thereby.

(D) This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document. IN WITNESS WHEREOF , _____the undersigned have executed this Agreement as of 26th JUNE of 2011 the date first above written.

*Manager & Worldwide Master License Holder:*
By: *Gabriel Guez*

GUEZ GABRIEL

*The Artist:*
By: *Almeriane© said*
*Anne-Stephanie Le Roy Garcia*

Anne-Stephanie Le Roy Garcia
ALMERIANE

ASLRG

ROZITA EBRAMI
Commission # 1828193
Notary Public - California
Los Angeles County
My Comm. Expires Dec 23, 2012

Rozita Ebrami

GG

9